**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

---

COLIN NICOL, WILLIAM MCCARTHY, LINDA NEUBELT, TERESA ORECHOVESKY, AND STEPHEN T. MICARE,

<em>Plaintiffs</em>,

<em>-v.-</em>

LYME COMPUTER SYSTEMS, INC., THE LYME COMPUTER SYSTEMS, INC. EMPLOYEE STOCK OWNERSHIP PLAN, JOSHUA LONGACRE, ESOP PLAN ADMINISTRATOR, PRESIDENT, CHIEF EXECUTIVE OFFICER, AND DIRECTOR, HENRY S. FLICKINGER JR., CHIEF FINANCIAL OFFICER AND DIRECTOR, ANDREW SULLIVAN, CHIEF REVENUE OFFICE AND DIRECTOR, AND MICHAEL NAGY, CHIEF TECHNOLOGY OFFICER,

<em>Defendants</em>.

---

Case No. _____

**COMPLAINT FOR VIOLATIONS OF ERISA AND THE COMPUTER FRAUD AND ABUSE ACT**

**JURY TRIAL REQUESTED**

## I. INTRODUCTION

1. This action arises under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001-1191c, and is brought by Plaintiffs under ERISA §§ 502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3), to enjoin acts and practices that violate the provisions of Title I of ERISA; to obtain appropriate equitable relief for acts of discrimination under ERISA § 510, 29 U.S.C. § 1140, and for damages; and to obtain such further equitable relief as may be appropriate to redress and to enforce the provisions of Title I of ERISA.

2.     This action also arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, for damages caused by Defendants' unauthorized access or damage to Plaintiffs' protected computer, which includes every computer connected to the internet.

3.     The Employee Retirement Income Security Act of 1974, as amended, is a federal law that sets minimum standards for most voluntarily established retirement and health plans in private industry to provide protection for individuals in these plans.  *See* 29 U.S.C. §1001 *et seq*.

4.     ERISA covers two types of retirement plans: defined benefit plans and defined contribution plans. Examples of defined contribution plans include 401(k) plans, 403(b) plans, employee stock ownership plans, and profit-sharing plans.

5.     A 401(k) Plan is a defined contribution plan that is a cash or deferred arrangement and receive favorable tax treatment under ERISA. Employees can elect to defer receiving a portion of their salary which is instead contributed on their behalf, before taxes, to the 401(k) plan. Under ERISA, a qualified distribution is generally one in which the employee receives after the age 59 ½, at which point the employee may withdraw some of all of the funds from the account.  For retiring employees seeking to mitigate taxes, the IRS specifically permits an employee over the age of 59 ½ to convert a 401(k) to a Roth IRA which reclassifies 401(k) funds as Roth savings by paying taxes on the amount converted.

6.     An Employee Stock Ownership Plan ("ESOP") is a form of defined contribution plan in which the investments are primarily in employer stock.

7.     ERISA requires that those who manage the investments act solely, exclusively and prudently in the interests of plan participants, and follow the governing Plan documents. ERISA §§ 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D).

8.     Title I of ERISA also creates per se prohibitions barring conflict of interest transactions between a plan and a party in interest. ERISA §§ 406-408, 29 U.S.C. §§ 1106-1108. Congress concluded that certain transactions present such a grave opportunity for abuse that, except in narrowly defined circumstances, they should be prohibited. Thus, ERISA bars fiduciaries from causing plans to engage in transactions with a party in interest. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1). ERISA § 406(a) prohibited transactions are subject to specified exemptions contained in ERISA § 408, 29 U.S.C. § 1108. ERISA also prohibits a fiduciary from dealing with the assets of a plan in his own interest or for his own account, ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), and prohibits a fiduciary from acting in any transaction involving the plan on behalf of a party (or representing a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

9.     ERISA requires plans to provide participants with plan information including important information about plan features and funding; sets minimum standards for participation, vesting, benefit accrual and funding; provides fiduciary responsibilities for those who manage and control plan assets; requires plans to establish a grievance and appeals process for participants to get benefits from their plans; gives participants the right to sue for benefits and breaches of fiduciary duty; and, if a defined benefit plan is terminated, guarantees payment of certain benefits through a federally chartered corporation, known as the Pension Benefit Guaranty Corporation ("PBGC"). *Id.*

10.     ERISA places certain responsibilities upon the plan administrator to assist with the proper management of ERISA qualified employee welfare-benefit plans and to promote communication with the plan beneficiaries.

11.     Employees participating in retirement plans have several important rights under the Employee Retirement Income Security Act (ERISA). Among them are the right to disclosure of important plan information and a timely and fair process for benefit claims.

12.     ERISA requires plan administrators to give plan participants in writing the most important facts they need to know about their retirement plans including plan rules, financial information, and documents on the operation and management of the plan. Some of these facts must be provided to participants regularly and automatically by the plan administrator. Others are available upon request, free-of-charge, or for copying fees.

13.     Plan participants are entitled to receive automatically when becoming a participant of an ERISA-covered retirement plan the summary plan description ("SPD"). 29 U.S.C.A. § 1024. The SPD tells participants what the plan provides and how it operates. It provides information on when an employee can begin to participate in the plan, how service and benefits are calculated, when benefits become vested, when and in what form benefits are paid, and how to file a claim for benefits. If a plan is changed, participants must be informed, either through a revised summary plan description, or in a separate document, called a summary of material modifications, which also must be given to participants free of charge. *Id*.

14.     The ERISA statute mandates that the Summary Plan Description be written in an understandable manner so as not to be confusing to the beneficiary.  29 U.S.C. § 1022(a) states that "[The SPD] shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

15.     In addition to the summary plan description, the plan administrator must automatically give participants a copy of the plan's summary annual report each year.  29 U.S.C.A. §§ 1023-24.

16.     In fact, the clear language of 29 U.S.C, 1024(b)(4) requires that "any…contract or other instrument under which the plan is establish or operated" be provided to the requesting participant or beneficiary.

17.     ERISA Section 510, 29 U.S.C. § 1140, provides:

"It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act."

18.     "Congress enacted § 510 primarily to prevent employers from discharging or harassing their employees in order to keep them from obtaining ERISA-protected benefits." *Kowalski v. L&F Prods.*, 82 F.3d 1283, 1287 (3d Cir. 1996). *See also Tolle v. Carroll Touch, Inc.*, 977 F. 2d 1129, 1133 (7th Cir. 1992).

19.     A discharge in retaliation for a participant's exercise of a plan right is also actionable under ERISA Section 510. "This statute is clearly meant to protect whistleblowers." *Hashimoto v. Bank of Hawaii*, 999 F.2d 408, 411 (9th Cir. 1993). According to the legislative history to Section 510, the section was "added by the Committee in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of economic sanctions or violent reprisals." S. Rep. No. 93-127, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin. News at 4838, 4872.

20.     As Section 510 has no enforcement or remedial provision, courts generally look to ERISA Section 502(a)(3) to determine standing. *Zipf v. American Tel. and Tel*., 799 F.2d 889, 891 (3d Cir. 1986). *See also Sandberg v. KPMG Peat Marwick, LLP*, 111 F.3d 331, 333 (2d Cir. 1997) ("Section 510 may be enforced by an action under section 502(a)(3) to protect employees from actions designed to prevent the vesting of pension rights."); *Millsap v. McDonnell Douglas Corp*., No. 03-5124, 2004 WL 1127189, at * 1 (10th Cir. 2004)("Section 502(a)(3) of ERISA provides the plan participant with his exclusive remedies for a §510 violation.").

21.     ERISA Section 502(a)(3), the "catchall" provision of ERISA's remedial section, permits a "participant, beneficiary or fiduciary:" (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

22.     Section 3(7) of ERISA defines a "participant" as an employee or former employee "who is or may become eligible for a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7).

23.     The Computer Fraud and Abuse Act ("CFAA") is an anti-hacking statute making it illegal to "access a computer without authorization or exceed authorized access, and thereby obtain…information from any protected computer." 18 U.S.C. § 1030. This statute also makes it illegal even to conspire or attempt to commit hacking, even if you didn't follow through with it or were not successful. *Id*.

24.     Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. 18 U.S.C. § 1030 (f).

25.     Defendant Lyme Computer Systems, Inc. (the "Company") established the "Lyme Computer Systems, Inc. Employee Stock Ownership Plan" ("the ESOP") on January 1, 2008 which is subject to ERISA regulation.

26.     Defendant Lyme Computer Systems, Inc. established the Lyme Computer Systems 401(k) Profit Sharing Plan, 02-0380993/001 ("the 401k Plan"), which is subject to ERISA regulation.

27.     This case involves the discharge, suspension, expulsion, discipline, and/or discrimination against certain participants (or beneficiaries) because they provided information to the United States Department of Labor ("DOL") in an inquiry or proceeding relating to potential violations of ERISA by agents of the Company.  Specifically, Plaintiffs reported that the members of the Board of Directors of the Company ("Board") that the excessive compensation pay to the Board was unfairly dilutive to all shareholders, in violation of ERISA §§ 406-408, 29 U.S.C. §§ 1106-1108.  Plaintiffs also reported that the 2021 valuation of the Company diverged significantly from the Company's prior performance for the past seven years in spite of the Company's best year for sales. Plaintiffs were particularly concerned to learn that each member of the Board, all of whom received annual salaries alone (before bonuses) well exceeding $100,000 annually, had taken substantial bonuses from loans provided by the federal government ("PPP loan") in violation of Section 1106(b) the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Public Law 116–136, as Amended Through P.L. 117–165, enacted August 5, 2022.

28.     Section 1106(b) of the CARES Act provides for forgiveness of a PPP loan only if the borrower is an "eligible recipient" as defined by 15 U.S.C. § 636(a)(36)(A)(iv) and rules and guidance. The intention is to promote the public interest and align the SBA's functions with other

governmental policies and allow the SBA to carry out the CARES Act's PPP provisions, including PPP loan eligibility.

29.     Plaintiffs reported to the DOL that the Board members may not have been eligible recipients because §1106(d)4 of the Cares Act only permits an employee from receiving a bonus from a PPP loan if his or her salary does not exceed $100,000 on an annualized basis for the funds to qualify for forgiveness.  In so doing, the Board failed to report contingent liabilities during the yearly ESOP audit for valuation purposes and instead provided a flawed, deflated valuation of the stock.

30.     On the basis of the information provided by Plaintiffs, the DOL opened a formal investigation of the Company.  On January 4, 2023, the DOL notified the Company of the investigation and subpoenaed documents related to Plaintiffs' complaint.

31.     On January 5, 2023, the day after receiving the administrative subpoena, CEO Josh Longacre, issued letters to Plaintiffs informing them that they had been put on administrative leave. The Company disabled the computers, network, and other information technology access of Plaintiffs.

32.     On Friday, January 6, 2023, IT Director Michael Nagy accessed one or more Plaintiffs' personal Gmail account without authorization, thereby accessing the personal devises connected to the internet of Plaintiffs without authorization, where he discovered a link to a Zoom meeting between Plaintiffs and their lawyer and accessed the private and confidential Zoom meeting without authorization.

## II. JURISDICTION AND VENUE

33.     Jurisdiction of this action is conferred upon the Court by ERISA § 502(a)(1)(B) and § 502(a)(3), 29 U.S.C. §§ 1132(a)(1) and (3), (c), (e)(i), and (j).

34.     Jurisdiction of this action is conferred upon the Court by 18 U.S.C § 1030(c)(4)(A)(i) for claims related to the Computer Fraud and Abuse Act ("CFAA").

35.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims that are so related to claims within its original or exclusive jurisdiction that they form part of the same "case or controversy" under Article III of the United States Constitution.

36.     Venue is appropriate in this Court under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2) because the ESOP was administered in New Hampshire, the transaction that breached ERISA took place in New Hampshire, and several Defendants reside or may be found in New Hampshire, venue for this action lies in the United States District Court for the District of New Hampshire.

37.     Because the allegations in this case do not involve a denial of an application for benefits in which any Plaintiff was entitled from the ESOP Plan, Plaintiffs need not exhaust their administrative remedies pursuant to the Claims Procedures in the ESOP Plan.  None of the ESOP Plans at issue herein have established administrative procedures as a first course of redress for any of the causes of actions involved in this case.

### III. PARTIES

38.     Plaintiff Colin Nicol is an individual residing at 374 Bahia Avenue in Key Largo, Florida 33037.

39.     Plaintiff William McCarthy is an individual residing at 25 Town Line Drive Cornish NH 03745.

40.     Plaintiff Linda Neubelt is an individual residing at 129 Philbrick Street, Farmington, Maine 04938.

41.     Plaintiff Teresa Orechovesky is an individual residing at 2012 Element Circle, Garner, NC. 27529.

42.     Plaintiff Stephen T. Micare is an individual residing at 19 Brook Road, Orford, NH 03777.

43.     Defendant Lyme Computer Systems, Inc., and at all times hereinafter mentioned was, a New Hampshire corporation engaged in the selling of computer software and related products within the jurisdiction of this Court with a principal place of business at 240 Mechanic Street, Suite 301, Lebanon, NH 03766 ("Lyme Computer" or the "Company"). The Company established the "Lyme Computer Systems, Inc. Employee Stock Ownership Plan" ("the ESOP") on January 1, 2008 which is subject to ERISA regulation.  The Company also established the Lyme Computer Systems 401(k) Profit Sharing Plan, 02-0380993/001 ("the 401k Plan"), which is subject to ERISA regulation.  The Company is named as a defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.   The Company is a "person" within the meaning of ERISA §§ 510 and 3(9), 29 U.S.C. §§ 1140 and 1002(9).

44.     The Company was named in the ESOP's Plan Document as the Employer, Plan Sponsor, and Plan Administrator to the ESOP.

45.     The ESOP is, and at all times hereafter mentioned was, an employee pension benefit plan within the meaning of ERISA Section 3(2), 29 U.S.C. § 1002(2). The ESOP was established by an employer, Lyme Computer, engaged in commerce or in an industry or activity affecting commerce, and is subject to Title I (including Title I, Part 4) of ERISA pursuant to ERISA Sections 4(a)(1) and 401(a), 29 U.S.C. §§ 1003(a)(1) and 1101(a). During all times hereinafter mentioned, the ESOP has been administered in New Hampshire, within the jurisdiction of this Court. The

ESOP is named as a defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

46.     At all material times, Defendant Joshua Longacre ("Longacre") was the President Chief Executive Officer, and a Director of the Company, and the ESOP Plan Administrator.  At all relevant times, Longacre is a "person" within the meaning of ERISA §§ 510 and 3(9), 29 U.S.C. §§ 1140 and 11002(9).

47.     At all material times, Defendant Henry S. Flickinger Jr. ("Flickinger") was the Chief Financial Officer and a Director of the Company.  At all relevant times, Flickinger is a "person" within the meaning of ERISA §§ 510 and 3(9), 29 U.S.C. §§ 1140 and 11002(9).

48.     At all material times, and Defendant Andrew Sullivan ("Sullivan") is the Chief Revenue Office and a Director of the Company.  At all relevant times, Sullivan is a "person" within the meaning of ERISA §§ 510 and 3(9), 29 U.S.C. §§ 1140 and 11002(9).

49.     Defendants Longacre, Flickinger, and Sullivan were the only members of the Company's Board of Directors. In those roles, Longacre, Flickinger, and Sullivan exercised discretionary authority and control with respect to the management of the ESOP by, *inter alia*, contracting with service providers for the Plan including the Plan's attorney and third-party administrator, and by appointing the Trustee. As such, Longacre, Flickinger, and Sullivan are fiduciaries within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii). During all relevant times, Longacre, Flickinger, and Sullivan lived and conducted their duties concerning the administration and management of the ESOP in the Lebanon, New Hampshire area, within the jurisdiction of this Court.

50.     At all relevant times, Defendant Michael Nagy ("Nagy") has been the Chief Technical Officer ("CTO") of the Company.   Nagy is a "person" within the meaning of ERISA

§§ 510 and 3(9), 29 U.S.C. §§ 1140 and 1002(9).  During all relevant times, Nagy conducted his duties concerning the IT management of the Company in the Lebanon, New Hampshire area, within the jurisdiction of this Court.

### IV.  GENERAL ALLEGATIONS

**A.     Background on the creation of the ESOP and Plaintiffs' Employment with the Company**

51.     Established on May 29, 1984, Lyme Computer is an authorized reseller of electronic and information technology ("EIT") products and services serving Federal Government, prime contractors, and businesses worldwide.

52.     The Company manages an expansive portfolio of contracting vehicles designed to streamline procurement and lower prices through volume discounts. As a provider of high-quality products and services with a personal touch and a strong history of building long-term customer relationships through trust and integrity, Lyme Computer boasts of its excellent performance through the efforts of its dedicated professionals who understand compliance regulations, unravel contract complexities, and are committed to helping their customers and strategic partners get the most out of these powerful purchasing options.

53.     Many of its sales team members have been with the Company for decades and have long-standing relationships with their customers.

54.     The sales team, and in particular Plaintiffs, are in a highly competitive business.  In fact, the customer reviews a salesperson's performance, assessing, *inter alia*, response time, pricing, product availability, professionalism, and the like.  Plaintiffs must stay in regular contact with their customers not only to service the accounts, but to provide quotes in a timely fashion to prevent the customer from sourcing their request with a competitor.  All Plaintiffs must work seven days a week and during any vacation to preserve these delicate relationships. Even a single day

without access to these customers is detrimental to the relationship.  A week without contact would damage the relationship beyond repair.

55.     On information and belief, in the 1990s, the Company established the Lyme Computer Systems 401(k) Profit Sharing Plan, 02-0380993/001 ("the 401k Plan") for employee participation.

56.     Plaintiff Colin Nicol, 67, was employed by the Company on May 1, 1989 and has worked as a Senior Accountant Executive for 33 years 8 months.  Nicol's income is exclusively from commissions earned from sales, and he receives a 40% commission on the net sale of any product.  Nicol has earned an average of $525,000 per year for the past three years and is has been the largest producer of sales every year for the past 10 years.  In 2022, Nichol surpassed $1,500,000 in gross revenue for the Company.  Nicol works remotely from his office in Florida.  Prior to January 5, 2023, Nicol had never been disciplined, expelled, or suspended from the Company. Nicol is a vested participant in both the ESOP and the 401k pursuant to Section 3(7) of ERISA.

57.     Plaintiff William McCarthy, 64, has worked on the Company's sales team for 17 years.  McCarthy's income is exclusively from commissions earned from sales, and he receives a 35% commission on the net sale of any product.  McCarthy works both remotely from his home office in Cornish, New Hampshire and at the Company's office in Lebanon, New Hampshire. Prior to January 5, 2023, McCarthy had never been disciplined, expelled, or suspended from the Company.  McCarthy is a vested participant in both the ESOP and the 401k pursuant to Section 3(7) of ERISA.

58.     Plaintiff Linda Neubelt, 65, began working for the Company in July 2002 and has worked in the sales department as a Federal Account Manager for more than 20 years.  Neubelt works from her home office in Maine.  Neubelt's income is exclusively from commissions earned

from sales, and she receives a 35% commission on the net sale of any product.  Her income for 2022 was $165,678.76.  Prior to January 5, 2023, Neubelt had never been disciplined, expelled, or suspended from the Company.  Neubelt recently signed a teaming agreement with General Dynamics which was recently awarded a $4.9 Billion contract from the Department of Defense which would pay commission to Neubelt in 2023 and beyond.  Neubelt also had two yesrs remaining on a contract with the United States Department of Energy for mathworks and solidworks software which she expects ongoing commissions. Neubelt is a vested participant in both the ESOP and the 401k pursuant to Section 3(7) of ERISA.

59.    Plaintiff Teresa Orechovesky,  50, started working for the Company on August 4, 2008 and has worked as an exclusively commissioned sales representative for 14 years.  Last year, Orechovesky's commissioned income surpassed $260,000. Orechovesky works from her home offices in North Carolina and Georgia.  Prior to January 5, 2023, Orechovesky was working through the final phases of a deal with a customer with a projected gross revenue of $400,000, with an expected commission of $35,000.  Prior to January 5, 2023, Orechovesky had never been disciplined, expelled, or suspended from the Company.  Orechovesky is a vested participant in both the ESOP and the 401k pursuant to Section 3(7) of ERISA.

60.    Plaintiff Stephen T. Micare, 63, has worked for Lyme Computer for 26 years as a network engineer with the title of Director of Technical Services.  Micare is a salaried employee who earns approximately $95,000 per year.  Prior to January 5, 2023, Micare had never been disciplined, expelled, or suspended from the Company.  Micare is a vested participant in both the ESOP and the 401k pursuant to Section 3(7) of ERISA.

61.     On October 1, 2008, the founder and then-President of the Company, Curt Vinson, announced that the Company had formed an ESOP and offered all employees an opportunity to participate therein pursuant to Section 3(7) of ERISA.

62.     To that end, Lyme Computer established the Lyme Computer Systems, Inc. Employee Stock Ownership Plan (the "Plan") effective January 1, 2008.  The Company provided all participants the SPD which explain what the Plan provided and how it operated. It also provided information on when an employee can begin to participate in the Plan, how service and benefits are calculated, when benefits become vested, when and in what form benefits are paid, and how to file a claim for benefits pursuant to Section 3(7) of ERISA.

63.     The ESOP is a tax-qualified retirement plan under Internal Revenue Code § 401(a) and an employee stock ownership plan within the meaning of ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6). It is sponsored by Lyme Computer Systems, Inc. and is the Company's sole shareholder.

64.     Because this Plan is an ESOP, a participant's ESOP Account was to be invested primarily in the Employer's common stock. However, once a participant has reached age 55 and completed 10 years of participation in the Plan, a participant could elect to diversify the investment of the portion of his or her ESOP Account invested in the Employer's common stock. A participant would be given this opportunity for a six-year period beginning with the year in which he or she first satisfies both these conditions. During the first five (5) years after the participant qualifies for this option, he or she would be permitted to diversify the investment of up to a total of 25% of the participant's investment in Employer stock. This 25% figure is a total for all five years and is reduced in any year by any amounts the participant has previously elected to diversify. In the sixth

year, the total amount the participant may elect to diversify (on a cumulative basis) is 50% of his or her ESOP Account.

65.     ESOP Accounts are valued on the last day of the Plan Year.

66.     Longacre was hired on July 1, 2009 as the Company's Vice President, and is charged with handling the ESOP.

67.     But as confusion and questions persisted, from July 1, 2009 to December 31, 2011, the Company held significant Company-wide meetings, together with site and remote collaborations with NCEO, the trustee, and other advisors to explain the rights of ESOP participants.

**B.     Plaintiffs' Questions About Their ESOP Rights Went Unanswered for Years**

68.     On January 30, 2012, Longacre established an ESOP committee in order to: (1) enhance the understanding of the ESOP and communicating the meaning of ownership benefits, rights, privileges, responsibility and accountability to all owners; (2) advise the ESOP participants about ESOP issues and encouraging involvement in company issues and activities; (3) foster meaningful participation from the employee owners by seeking a broad-based approach to problem solving that would ultimately drive employee satisfaction and growth in the Company's value.

69.     The Company amended the Plan in 2014 which was memorialized in the Lyme Computer Systems, Inc. Employee Stock Ownership Plan Summary Plan Description dated January 1, 2014.

70.     The 2014 PDS was confusing and not understandable to the employees, and employees sought answers to the ambiguities and lack of clarity of the 2014 SPD from the ESOP Committee, but neither the Committee nor the executives could provide the answers.  The questions before the Committee then became known as "the Infamous ESOP Questions."

71.     Thereafter employees proactively engaged agents of the National Center for Employee Ownership ("NCEO") as well as the then-Plan trustee to explain the mechanics of the Plan.

72.     From September 1, 2016 to December 31, 2017, the ESOP Committee held only two annual meetings – one in 2016 and the other in 2017.  Longacre, now the Plan Administrator, became increasingly unwilling and failed to provide information to employees about the ESOP beyond providing the minimum ESOP-required documents.

73.     On October 5, 2017, Plaintiff Micare emailed the then Company executives, Longacre, Vinson, and Flickinger to follow up on a specific question posed during the 2017 ESOP Committee meeting.  Micare pointed out that there was a discrepancy between the ESOP Benefits Summary document and the information provided by staff.  In particular, Micare wrote: "I have been sincerely asking this question for several years now and I have been looking for a specific detailed answer to this one specific question all along."  However, no answer was forthcoming.

74.     Frustrated that the Plan Administrator Longacre continued to ignore him, on March 22, 2019, Micare contacted Corey Rosen at NECO.com to discuss his concerns that the Plan Administrator refused to answer these critical ESOP payout questions and refused to provide contact information to ESOP trustee advisor.  Mr. Rosen informed Micare that the Plan Administrator must provide the information of trustee and advisor contact upon request.

75.     The remaining Plaintiffs and other employees similarly sought answers to their ESOP questions, but Longacre continued to stonewall.

76.     On July 1, 2018, Curt Vinson retired, and Longacre was promoted to the position of President of the Company.

77.     At that time, Vinson, Longacre, and Flickinger were the only members of the Board of Directors.

78.     On June 1, 2019, Longacre and Flickinger vote to remove Vinson from the Board. On information and belief, Vinson learned that Longacre and Flickinger intended to change the bonus structure to the Board.  While both Longacre and Flickinger receive salaries far exceeding $100,000, the Board had also historically taken bonuses at the end of the year from the net profits in any given year.  Longacre and Flickinger proposed to award themselves bonuses quarterly based on the *gross* revenues in addition to other enhanced compensation.

79.     Vinson objected to these changes because it would negatively affect the Company's valuation and therefor the value of the Company's stock.

80.     Longacre and Flickinger replaced Vinson with Andrew Sullivan.

81.     Benoit Financial Planners ("Benoit") had previously been appointed by the Board to serve as investment advisors for both the ESOP and the 401k. Elyse Wholey, Senior Client Relationship Manager, was assigned to answer employee questions.

82.     Nearing the age of 63, Micare began planning for retirement. In December 2021, Micare sought to withdraw all of the funds in the 401k, managed by Benoit, and convert them into an IRA, as was his right under federal tax laws.

83.     Micare informed Longacre that he had elected to make this conversion, but Longacre directed him to Flickinger, the CFO.  Micare then notified Flickinger, who flew into a profanity-laced rage insisting that Micare could not withdraw his 401k funds from the Company.

84.     Between December 2021 and the end of May 2022, Micare requested the forms and procedures to withdraw his 401k funds, as he was entitled to do.  Elyse Wholey similarly

berated Micare, insisting that withdrawing his funds was not in his best interests and refused to assist in the withdrawal.  For five months Micare fought to withdraw his 401k funds.

85.     On May 5, 2022, Micare retained a high-end accountant, Marc Burger, who was familiar with ESOP and 401k.  Over the course of three business days at a cost of $848, Mr. Burger answered all of the ESOP questions that Longacre refused to answer over the course of five years.

86.     Thereafter, on May 25, 2022, Micare retained Mr. Burger at a cost of $1,000 to provide the necessary information needed to withdraw the funds from his 401k and convert them to an IRA.

87.     Soon thereafter, Micare was able to withdraw these funds.

88.     On June 1, 2022, Micare reported his concerns about how both the ESOP and the 401k were being handled by Cindi Taylor, Vice President of Human Resources and Compliance ("Taylor").

89.     Taylor arranged for Micare to meet directly with Longacre on June 27, 2022 to discuss the widespread complaints about Longacre's ESOP disengagement.  Longacre agreed to hold annual meetings going forward and to engage David Artell, a third-party advisor, to clarify ESOP issues for employees.

**C.     Plaintiffs' Complaints About Violations of ERISA and Participation in the Department of Labor Investigation**

90.     With most of his ESOP questions answered, Micare sent the list of questions and answers to numerous ESOP participants who had struggled to obtain this information.  These answers generated great interest and prompted lengthy conversations with the ESOP participants.

91.     In June 2022, Neubelt contacted Georgia Devine ("Devine") at the United States Department of Labor, Employee Benefits Security Administration ("DOL") in Boston to complain that the Board and executive team was engaged in various schemes that devalued the Company's

shares. Neubelt explained that information had leaked through the Company that the executives had altered their compensation structure to enrich themselves at the expense of the other Participants.  Neubelt also expressed concern that the Directors had recently hired a cadre of friends and family, all on salary, who were not generating sales and that these additional salaries negatively affected the value of the Company.  She also relayed that Longacre had been engaging in dangerous business choices, such as teaming with companies on exceedingly low margin but nonetheless taking bonuses in a manner that could put the Company in precarious financial positions.  Neubelt also reported that the participants had been unable to have basic ESOP questions answered for years. Such alleged schemes, if true, give rise to violations under ERISA. Additionally, such alleged schemes would also directly and adversely affect the Company's sponsored plans in which Neubelt participated.

92.     Devine asked Neubelt to provide any further information and documentation to substantiate the claims.

93.     On July 15, 2022, Micare contacted Georgia Devine at the DOL to report that the Company's PDS was confusing and lacked clarity on certain important issues even though the ERISA statute mandates that the Summary Plan Description be written in an understandable manner so as not to be confusing to the beneficiary.  Micare complained that ESOP participants had been unable to get basic information about accessing benefits from the Plan Administrator despite years of seeking this information.  If true, Micare's claims give rise to violations under ERISA 29 U.S.C. § 1022(a).

94.     Micare also reported that he and many employees have valid concerns that the Board has devaluing the ESOP and shortchanging the participants' retirement accounts. He also complained that the Longacre and Flickinger, together with Benoit, intimidated, harassed, and

prevented him from withdrawing his 401k funds to which he was entitled. Devine asked Micare to provide any further information and documentation to substantiate the claims.  If true, Micare's claims give rise to violations under ERISA. Additionally, such alleged actions would also directly and adversely affect the Company's sponsored plans in which Micare participated.

95.     Thereafter, Micare provided a dozen document to the DOL evidencing how the Plan Administrator had denied participants basic information about accessing the benefits of the ESOP for years.

96.     On August 26, 2022, Curt Vinson reached out to the ESOP trustee and reported several concerns regarding how Lyme Computer Board of Directors was handling the ESOP.

97.     Beginning in August 2022, Plaintiffs Micare, Neubelt, and Nicol, together with Curt Vinson, the former President and ESOP founder, and Andrew Lumley, then an account manager who had worked at the Company for decades, began to have weekly Zoom meetings into the Fall to discuss their concerns about the management of the ESOP.

98.     Beginning in early November 2022, Plaintiffs Orechovesky and McCarthy joined the Zoom meetings (together with the others hereinafter referred to as "the ESOP Participant Group."

99.     Plaintiffs, together with Vinson and Lumley, exchanged private Gmail addresses to facilitate the flow of information to one another and to schedule Zoom meetings so that they could maintain privacy during their meetings.  Plaintiffs were aware that emails sent to their email addresses owned by the Company could be accessed by the Company.

100.     On October 6, 2022, the Company provided the ESOP Participants with the 2021 ESOP Summary Annual Report, the Participant's individual ESOP Annual Participant Statement,

the Participant's individual Diversification Statement, and the Participant's individual ESOP Benefit Statement Supplement.

101.    The valuation of the Company's shares as contained in the Summary Annual Report shocked many employees, but Plaintiffs in particular who are near retirement age.  Although the Company had experienced one of its highest years for revenue, the shares only grew 0.474% from 2020 to 2021.  The 2021 valuation of the Company diverged significantly from the Company's prior performance for the past seven years in spite of the Company's best year for sales.  To wit:

| Year | Price per share | PPS YoY Gain ($) | PPS YoY Gain (%) |
|---|---|---|---|
| 2015 | $ 207.11 | | |
| 2016 | $ 372.26 | $ 165.15 | 79.740% |
| 2017 | $ 851.46 | $ 479.20 | 128.727% |
| 2018 | $ 944.86 | $ 93.40 | 10.969% |
| 2019 | $ 1,169.99 | $ 225.13 | 23.827% |
| 2020 | $ 1,352.95 | $ 182.96 | 15.638% |
| 2021 | $ 1,359.36 | $ 6.41 | 0.474% |

102.    The 2021 Summary Annual Report advised participants and beneficiaries as follows:

> "You have the right to receive a copy of the full annual report, or any part thereof, on request. To obtain a copy of the full annual report, or any part thereof, write or call the office of Lyme Computer Systems, who is Plan Administrator at 240 Mechanic Street, Suite 301, Lyme NH 03766, (603) 795-4000. The charge to cover copying cost will be $2.00 for the full annual report, or $0.25 per page for any part thereof. You also have the right to receive from the plan administrator, on request and at no charge, a statement of the assets and liabilities of the plan and accompanying notes, if any, or a statement of income and expenses of the plan and accompanying notes, if any, or both. If you request a copy of the full annual report from the plan administrator, these two statements and accompanying notes, if any, will be included as part of that report."

103.    On October 6, 2022, Nicol and Neubelt requested in writing to the Plan Administrator copies the full annual report, a statement of the assets and liabilities of the Plan and

accompanying notes, if any, a statement of income and expenses of the Plan and accompanying note, and evidence of the fidelity bond, to which they were legally entitled to receive within 30 days of the request.

104.    Since that time, the Plan Administrator has failed and refused to comply with a request for the information which he is required by ERISA to furnish to them.

105.    On October 13, 2022, Curt Vinson contacted Devine to lodge complaints about the alleged excessive compensation that executives had given themselves.  If true, Vinson's claims give rise to violations under ERISA. Additionally, such alleged actions would also directly and adversely affect the Company's sponsored plans in which Vinson participated.

106.    The ESOP Participant Group met to discuss why the stock price had been diluted. The Group was aware, through public documents, that the Company had taken PPP loans, and they questioned how this may have impacted the bottom line.  They had also heard the rumors that the executives had substantially increased their own bonus and incentive packages, which would dilute the net profits, and thus negatively impact the value of the shares.  The ESOP Participant Group then demanded an all-Company meeting to demand an explanation of the poor value of the shares.

107.    On November 1, 2022, during the all-Company meeting, Defendant Mike Nagy demonstrated to all users in the Company how to access the Lyme Computer Internet – called "SharePoint" -- and search for *any* document on the network. He welcomed and invited everyone to try it.

108.    Neubelt accessed the SharePoint as instructed and discovered documents related to executive compensation that concerned her.

109.   In particular, Neubelt found documents evidencing that the Board had begun giving themselves bonuses based on a percentage of gross profit as opposed to a percentage of the net profit.

110.   She also discovered that the Company had taken two PPP loans each in the amount of $554K ($1,108,000 total) evidencing that these PPP loans were added to the gross profit calculations of the company and approved to be bonused to the executives.

111.   Neubelt then shared this document with the ESOP Participant Group.

112.   Plaintiffs then reported to the DOL that the members of the Board of Directors of the Company ("Board") that the excessive compensation pay to the Board was unfairly dilutive to all shareholders, in violation of ERISA §§ 406-408, 29 U.S.C. §§ 1106-1108, providing the documents accessed from the SharePoint system.

113.   Plaintiffs also reported that the 2021 valuation of the Company diverged significantly from the Company's prior performance for the past seven years in spite of the Company's best year for sales. Plaintiffs were particularly concerned to learn that each member of the Board, all of whom received annual salaries well exceeding $100,000 annually, had taken substantial bonuses from loans provided by the federal government ("PPP loan") through the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Public Law 116–136, as Amended Through P.L. 117–165, enacted August 5, 2022.

114.   This was particularly concerning because Section 1106(b) of the CARES Act provides for forgiveness of a PPP loan *only* if the borrower is an "eligible recipient" as defined by 15 U.S.C. § 636(a)(36)(A)(iv) and rules and guidance. The intention is to promote the public interest and align the SBA's functions with other governmental policies and allow the SBA to carry out the CARES Act's PPP provisions, including PPP loan eligibility.

115.    Plaintiffs reported to the DOL that the Board members may not have been eligible recipients because §1106(d)4 of the Cares Act only permits an employee from receiving a bonus from a PPP loan if his or her salary does not exceed $100,000 on an annualized basis for the funds to qualify for forgiveness.  In so doing, the Board likely failed to report contingent liabilities during the yearly ESOP audit for valuation purposes and instead provided a flawed, deflated valuation of the stock.

116.    On November 2, 2022, Andrew Lumley shared a screen shot of executive compensation and PPP money to the ESOP Participant Group.  However, instead of emailing McCarthy at his personal Gmail address, Lumley accidentally sent the message to McCarthy's email address at Lyme Computers.

117.    On November 8, 2022, the Company held the first ESOP annual meeting since 2017. The meeting was heavily attended. David Artell, the newly acquired third-party administrator answered the employees' questions and confirmed that the participants must be permitted to contact him directly.  However, Longacre refused to answer any questions about the low value of the Company shares.

**D.    Defendants' Decision to Place Plaintiffs on Administrative Leave, Effectively Terminating Their Employment**

118.    On the basis of the information provided by Plaintiffs, the DOL opened a formal investigation of the Company.

119.    On or about January 4, 2023, the DOL notified the Company of the investigation into Defendants' alleged ERISA violations and subpoenaed documents related to the investigation.

120.    On or about January 4, 2023, in an effort to discover who provided the information to the DOL, Mike Nagy accessed McCarthy's Company email and discovered that Plaintiffs had provided information in any inquiry or proceeding relating the management of an ESOP regulated

25

by ERISA. Nagy also sought information about who McCarthy had been communicating with about the DOL investigation.  McCarthy's November 2, 2022 email revealed that the ESOP Participant Group was copied on the correspondence.

121.     On January 5, 2023, the day after the administrative subpoena was served on the Company, Longacre, issued letters to members of the ESOP Participant Group, namely the five named Plaintiffs, Curt Vinson, and Andrew Lumley, both of whom are now retired.  The letter informed the Plaintiffs that they had been put on administrative leave stating: "Lyme Computer Systems dba Lyme Technology Solutions has experienced an information security breach. We have learned that confidential company (not customer) information has been accessed and disclosed outside of our company.  We are in the process of investigating the breach and determining next steps. [ ] In the meantime, we have taken steps to temporarily disable the computer, network, and other information technology access of certain employees, including you."

122.     The letter to the members of the ESOP Participant Group also advised them to "preserve all information you have in your personal accounts, devices, or files that pertains to Lyme. This includes emails, text messages, photos, and other documents and communications, regardless of whether they are in hard copy or electronic form, and regardless of whether stored in paper files, or in a computer, smartphone, drive, etc."

123.     Defendants placed Plaintiffs on administrative leave with the intent to retaliate against them for providing information to an investigator from the Department of Labor's investigation into Defendants' alleged ERISA violations and having cooperated with the investigation.

124.     On Friday, January 6, 2023, as part of its "investigation of the breach," all Defendants conspired with Chief Technology Officer Michael Nagy to unlawfully access one or

more Plaintiffs' personal Gmail account without authorization, thereby access one or more personal devices connected to the internet.

125.    Pursuant to this conspiracy, on Friday, January 6, 2023, Nagy unlawfully accessed one or more Plaintiffs' personal Gmail account without authorization and thereby gained access to the personal computers, tablets, phones, and laptops of Plaintiffs without authorization and discovered a link to a Zoom meeting between Plaintiffs and their lawyer and accessed the private and confidential Zoom meeting without authorization and to which he was not invited.

126.    The Company has not reinstated Plaintiffs in part or in whole because Mike Nagy illegally accessed a private Zoom meeting with Plaintiffs' counsel to discuss their legal options. But for Mike Nagy's illegal access of Plaintiffs' private Gmail accounts, the Company would have reinstated Plaintiffs.

127.    Plaintiffs have been damaged in amount exceeding $5,000.00 as a result of Nagy's illegal access into private email accounts.

128.    On information and belief, Defendants continue to access or to attempt to access Plaintiffs' personal devices connected to the internet without authorization.

129.    Defendants have locked Plaintiffs out of their computers, the network, and other information technology access.  Defendants have ordered Plaintiffs to cease all work on behalf of the Company.

130.    Plaintiffs have suffered severe financial and reputational damage as a result of Defendants' actions.  All Plaintiffs but Micare are sales account managers who earn their income exclusively through commissions. All of these sales Plaintiffs have numerous outstanding sales orders pending that have not been invoiced yet because the customer has not taken delivery of the

product. Commission on these sales is not due until the invoice is generated and the customer pays the invoice.

131.     Further, on information and belief, all of these open sales orders have been assigned to other sales personnel to whom the commissions will be paid.  Plaintiffs will not receive the commission on these open invoices.

132.     All of the quote requests from the customers that Plaintiffs have cultivated over decades are being processing by other sales representatives of the Company. Plaintiffs will be deprived of these commissions that are rightfully theirs.

## COUNT I

### VIOLATIONS OF ERISA § 510, 29 U.S.C. § 1140

133.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint and further alleges:

134.     Plaintiffs engaged in protected activity when they provided information to the United States Department of Labor ("DOL") in an inquiry or proceeding relating to potential violations of ERISA by agents of the Company.

135.     By the conduct described in paragraphs above, in causing Plaintiffs to be placed on paid administrative leave because of their complaints to the DOL regarding alleged improper conduct by Defendants, which complaints, if true, give rise to violations under ERISA, and for Plaintiffs' participation in a DOL investigation, Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company, acting in concert and/or as co-conspirators, violated ERISA § 510, 29 U.S.C. § 1140.

136.     Defendants placed Plaintiffs on administrative leave with the intent to retaliate against them for providing information to an investigator from the Department of Labor's

investigation into Defendants' alleged ERISA violations and having cooperated with the investigation.

137. As a direct and proximate result of the actions of Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company in placing Plaintiffs on administrative leave, Plaintiffs have suffered harm from the stigma of this adverse action, damage to their reputations, damage to their economic relationships with their customers, and Defendants have chilled the exercise of protected rights by sending the message that employees will be subject to adverse action for speaking to the Department of Labor or complaining about perceived violations of ERISA, for which Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company are jointly and severally liable.

138. By the conduct described in paragraphs above, in failing to rehire Plaintiffs following Nagy's unlawful hacking of Plaintiffs' personal Gmail accounts, which enabled him to access a private Zoom meeting involving Plaintiffs and their counsel, to which Nagy was not invited, because of Plaintiffs' complaints regarding alleged improper duct by Defendants, which complaints, if true give rise to violations under ERISA, and for Plaintiffs' participation in a DOL investigation, Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company violated ERISA § 510, 29 U.S.C. § 1140.

139. By the conduct described in paragraphs above, by acting in concert and/or as co-conspirators with Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company to effect the removal of Plaintiffs from their employment from the Company and to prevent them from performing any services or work for the Company, contacting their customers, or accessing their information because of their complaints regarding alleged improper conduct by Defendants, which complaints, if true give rise to violations under ERISA, and for Plaintiffs' participation in a DOL investigation, Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company violated,

ERISA § 510, 29 U.S.C. § 1140.

140.    As a direct and proximate result of the Defendants' illegal and retaliatory conduct directed to the Plaintiffs, the Plaintiffs have suffered damages from the actual or constructive discharge with the resulting loss of their employment, loss of past, present, and future income, past, present, and future lost benefits, and other damages, including but not limited to sick pay and/or a leave of absence without pay. All of these elements of damage will continue in the future.

141.    The Plaintiffs are entitled to recovery of these damages along with an award of their attorney's fees, litigation expenses and costs for which Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company are jointly and severally liable.

142.    As a direct and proximate result of the breaches and violations set forth above, Plaintiffs are entitled to such equitable or remedial relief as the Court may deem appropriate, including reinstatement of Plaintiffs, if appropriate and feasible, restoring wages that would have been paid as part and parcel of make whole restitution, compensation of Plaintiffs for other consequential damages resulting from their placement on administrative leave and constructive termination, including interest and employee benefits.

## COUNT II

### VIOLATIONS OF ERISA 29 U.S.C. § 1024(b)(4)

143.    Plaintiffs incorporate by reference the preceding paragraphs of this complaint and further alleges:

144.    The Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA") imposes civil liability for unauthorized access or damage to a protected computer, which includes every computer connected to the internet. This statute also makes it illegal even to conspire or attempt to commit hacking, even if attempts to access were not successful. *Id.*

145.    Section 1030(a)(2)(C) of CFAA prohibits any person from intentionally accessing a protected computer, without authorization or by exceeding authorized access, and obtaining information from a protected computer.

146.    Section 1030(a)(4) of CFAA prohibits any person from knowingly and with intent to defraud accessing a protected computer, without authorization or by exceeding authorized access, to obtain anything of value or further a fraud.

147.    Section 1030(a)(5)(A) of CFAA prohibits any person from knowingly, intentionally, and without authorization causing the transmission of a program, information, code, or command to a protected computer, and causing damage.

148.    Sections 1030(a)(5)(B) and 1030(a)(5)(C) of CFAA which prohibit any person from intentionally accessing a protected computer without authorization and, as a result of such conduct, recklessly causing damage and loss.

149.    Any person who suffers damage or loss by reason of a violation of 18 U.S.C. § 1030(a) may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. 18 U.S.C. §§ 1030(c)(4)(A)(i) and 1030 (f).

150.    Defendants placed Plaintiffs on administrative leave with the intent to retaliate against them for providing information to an investigator from the Department of Labor's investigation into Defendants' alleged ERISA violations and having cooperated with the investigation.

151.    On Friday, January 6, 2023, as part of its "investigation of the breach," all Defendants conspired with IT Director Michael Nagy to unlawfully access one or more Plaintiffs' personal Gmail account without authorization.

152.    Pursuant to this conspiracy, on Friday, January 6, 2023, Nagy unlawfully access one or more Plaintiffs' personal Gmail account and thereby gained access to the personal computers, tablets, phones, and laptops of Plaintiffs without authorization and discovered a link to a Zoom meeting between Plaintiffs and their lawyer and accessed the private and confidential Zoom meeting without authorization.

153.    The Company has not reinstated Plaintiffs in part or in whole because Mike Nagy illegally accessed a private Zoom meeting with Plaintiffs' counsel to discuss options.  But for Mike Nagy illegal accessed of Plaintiffs' private Gmail accounts, the Company would have reinstated Plaintiffs.

154.    Plaintiffs have been damaged in amount exceeding $5,000.00 as a result of Nagy's illegal access into private email accounts, for which Defendants are jointly and severally liable.

155.    On information and belief, Nagy, on his own accord and at the instruction of the other Defendants, continue to access or to attempt to access Plaintiffs' personal devices connected to the internet without authorization.

156.    Plaintiffs are entitled to such equitable or remedial relief as the Court may deem appropriate, including ordering Defendants to cease all efforts or activity to access Plaintiffs' personal devices connected to the internet without authorization.

## COUNT III

### VIOLATIONS OF ERISA 29 U.S.C. § 1024(b)(4)

157.    Plaintiffs incorporate by reference the preceding paragraphs of this complaint and further alleges:

158.    29 U.S.C.  § 1024(b)(4) states that "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description,

and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."

159.    29 U.S.C. § 1024(b)(4) requires the Plan Administrator to provide "the latest annual report, any terminal report, or any…contract or other instrument under which the plan is establish or operated" to any participant or beneficiary upon request.

160.    29 USC §1021 requires the Plan administrator of each employee benefit plan to furnished in accordance with section 1024(b) of this title to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan (1) a summary plan description described in section 1022(a)(1) and (2) the information described in sections 1024(b)(3) and 1025(a) and (c) of this title.

161.    Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $110 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation . . . with respect to any single participant or beneficiary, shall be treated as a separate violation. 29 USC §1132(c).

162.    On October 6, 2022, Nicol and Neubelt requested in writing to the Plan Administrator copies the full annual report, a statement of the assets and liabilities of the Plan and accompanying notes, if any, a statement of income and expenses of the Plan and accompanying

note, and evidence of the fidelity bond, to which they were legally entitled to receive within 30 days of the request.

163.   Since that time, the Plan Administrator Longacre has failed and refused to comply with a request for the information which he is required by ERISA to furnish to Nicol and Neubelt.

164.   As a direct and proximate result of the violations identified in the paragraphs above, Defendant Longacre is personally liable to Plaintiffs Nicol and Neubelt in the amount of up to $110 a day from the date of such failure or refusal.

165.   **PLAINTIFFS REQUEST A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Honorable Court:

A.   Order Defendant Lyme Computer to immediately reinstate Plaintiff to their position with the Company that is equivalent, in both remuneration and responsibilities, to the positions in which they occupied on January 4, 2023, *if the circumstances enable Plaintiffs to re-capture the sales and the customers they serviced prior to the administrative leave on January 5, 2023 without harassment or discrimination of Defendants*;

B.   If the Court finds that reinstatement is feasible, order Defendants Longacre, Flickinger, Sullivan, Nagy, and the Company to compensate Plaintiffs for lost wages, with interest, from the date of their termination until the date of reinstatement, with Defendants Longacre, Flickinger, Sullivan being jointly and severally liable for the full amount of lost wages and interest;

C.   Order Defendants to compensate Plaintiffs for any additional expenses that they incurred as a result of being placed on administrative leave, including employee benefits that Plaintiffs would have received but for Defendants' unlawful discrimination;

D.      If the Court finds that reinstatement not feasible because the amount of time that has elapsed since the administrative leave was imposed constructively terminates their employment by virtue of a lost customer base, schedule and conduct a trial by jury on all matters referable to the jury;

E.      Upon trial, direct that judgment be entered in favor of the Plaintiffs and against the Defendants on all counts of the within Complaint for all compensatory, consequential, incidental and enhanced damages;

F.      Award the Plaintiffs prejudgment interest to the date of judgment;

G.      Order Defendant Longacre to pay $110.00 per day for failure to provide information required by law to Plaintiffs Nicol and Neubelt as required under ERISA section 502(a)(1)(A);

H.      Permanently enjoin Defendants from violating the provisions of Title I of ERISA;

I.      Preliminarily enjoin Defendants from accessing or attempting to access, or conspiring to access Plaintiffs' personal devises connected to the internet, including computers, laptops, tablets, telephones, or any other device that accesses the internet, and order Defendants to cease immediately any and all activity to access personal emails, text messages, photographs, and other documents and communications stored on personal devises connected to the internet;

J.      Permanently enjoin Defendants from violating the provisions of the Computer Fraud and Abuse Act (18 U.S.C. § 1030);

K.      Award the Plaintiffs their reasonable attorney's fees, litigation expenses, interest and costs; and

L.      Grant such other and further relief as may be appropriate.

Respectfully Submitted,

COLIN NICOL, WILLIAM MCCARTHY,
LINDA NEUBELT, TERESA ORECHOVESKY,
AND STEPHEN T. MICARE, PLAINTIFFS


COLEMYERS, PLLC

Date: January 15, 2023          By:    _/s/ Carolyn Cole_____
                                        Carolyn Cole, Esq.  NH Bar #14549
                                        18 Bank Street
                                        Lebanon, NH  03766
                                        603-678-8070
                                        ccole@coleassociateslaw.com